## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **TORIANO JORDAN** | **CIVIL ACTION** |
| **VERSUS** | **NO. 05-6344** |
| **TIM WILKINSON, WARDEN** | **SECTION "I"(6)** |

## <u>REPORT AND RECOMMENDATION</u>

This matter was referred to the United States Magistrate Judge for the purpose of conducting hearings, including an evidentiary hearing, if necessary, and submission of proposed findings and recommendations for disposition pursuant to 28 U.S.C. §636(b)(1)(B) and (C), and as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases. Upon review of the entire record, the court has determined that this matter can be disposed of without an evidentiary hearing. *See* 28 U.S.C. §2254(e)(2). Accordingly, it is hereby recommended that the instant petition be **DENIED WITH PREJUDICE.**

## I.  PROCEDURAL HISTORY

Petitioner, Toriano Jordan, is a state prisoner currently incarcerated in the Winn Correctional Center in Winnfield, Louisiana. On August 25, 1997, petitioner was charged

by bill of information with possession with the intent to distribute cocaine.[1]  On November 21, 1997, following trial by jury, petitioner was found to be guilty as charged.[2]  On March 11, 1998, following a hearing, petitioner was adjudicated to be a multiple offender and was sentenced to 20 years incarceration at hard labor.[3]

Pursuant to petitioner's appeal, the Louisiana Fifth Circuit Court of Appeal, on March 10, 1999, affirmed petitioner's conviction and sentence, but remanded the matter with instructions to the trial court to advise petitioner with regard to his prescriptive period for seeking post-conviction relief.  *State v. Jordon* [sic], 732 So.2d 569 (La. App. 5 Cir. 1999).  On September 17, 1999, the Louisiana Supreme Court denied petitioner's writ application, thereby rendering his conviction and sentence final.  *State v. Jordan*, 747 So.2d 1098 (La. 1999).

Following the completion of his direct appeal proceedings, petitioner sought post-conviction relief.  Petitioner's efforts in this regard culminated on November 15, 2004, when the Louisiana Supreme Court denied his writ application.  *State v. Jordan*, 887 So.2d 477 (La. 2004).

With respect to the instant application for federal habeas corpus relief, the State concedes that petitioner has exhausted his state court remedies as required under *Rose v.*

---

[1]*See* State rec., vol. 1 of 5, p. 9.

[2]*See* State rec., vol. 1 of 5, pp. 6-7.

[3]*See* State rec., vol. 2 of 5, pp. 260-281.

2

*Lundy*, 455 U.S. 509, 102 S. Ct. 1198, 71 L. Ed. 2d 379 (1982).  Further, the State does not

contest the timeliness of the instant action.

## II.  STATEMENT OF FACT[4]

At approximately 1:30 p.m. on July 18, 1997, Officer Crossen, employed

with the Jefferson Parish Sheriff's Office, received an anonymous telephone call that a

large quantity of cocaine would be transported, via the elevated Westbank Expressway,

from the Claiborne Gardens area to Algiers.  The caller gave information about the make,

color, year, and license plate of the vehicle, and informed that the vehicle would be

occupied by two black males.  Officer Blankenship was present at the sheriff's office

when Officer Crossen received the anonymous call.

At approximately 2:00 p.m., Officers Blankenship and Crossen began

surveillance of the Claiborne Gardens area. At 2:25 p.m., they saw a vehicle matching the

description given by the anonymous caller.  The officers followed the vehicle in two

unmarked police units as it traveled east on the Westbank Expressway.  After Officer

Crossen verified the information provided by the anonymous caller, Officer Blankenship

pulled into the lane beside [the] driver's side of the suspects' car.  Since Officer

Blankenship was driving a pickup truck, he testified that he was able to look down into

---

[4]The statement of fact is taken from the Louisiana Fifth Circuit's opinion, *State v. Jordon* [sic], 732 So.2d 569, 570-571 (La. App. 5 Cir. 1999).

the interior of the suspects' car and see the lap of the passenger.  He identified the

defendant in court as the passenger.  Officer Blankenship testified that although he could

not remember whether the window of the suspects' vehicle was open or shut, he saw the

defendant holding a clear plastic bag containing a white substance.

After notifying Officer Crossen of what he had seen, the officers stopped

the suspects' vehicle and ordered them out of the car.  Initially, only the driver, Kendrick

Chisolm, obeyed.  The defendant did not exit the car.  The officers observed defendant

leaning over towards the floor of the passenger side front seat, but could not see what he

was doing inside the car.  After Chisolm showed Officer Crossen his driver's license, the

officers ordered him to return to his vehicle to get proof of insurance.  The officers again

ordered the defendant to exit the car.  Chisolm walked back to the car to obtain proof of

insurance, and Officer Blankenship heard him tell the defendant to get out of the car.  The

defendant then complied.  Meanwhile, one of the officers ran an NCIC check on the two

men, which revealed two outstanding warrants for the defendant.

After Jordon [sic] and Chisolm exited the car, Officer Blankenship walked

to the passenger side of the car, where he saw two clear plastic bags of a white substance

on the passenger floorboard.  The defendant and Chisolm were arrested and advised of

their rights. After backup officers arrived, Officers Blankenship and Crossen opened the

car's glove compartment.  More clear bags containing a white substance fell to the

floorboard.  Officer Crossen performed a field test on the white substance in one of the

4

plastic bags, which tested positive for cocaine.

Officer Blankenship identified State Exhibit Number One as the nineteen (19) clear plastic bags containing cocaine that were seized from the suspects' car.  He identified State Exhibit Number 5 as a photograph of the cocaine, which was concealed just behind the glove compartment.

Following his arrest, the defendant gave a statement to Officer Crossen. According to Officer Crossen, the defendant told him that his cousin was the driver of the vehicle, and that the defendant wanted to claim ownership of the cocaine because he did not want his cousin to get in trouble.  Officer Crossen again advised the defendant of his rights, and the defendant signed a waiver of his rights.  Officer Crossen denied that he promised the defendant anything in return for his statement.  Thereafter, the defendant gave a taped statement wherein he admitted that the cocaine was his, that he had intended to distribute it, and that he had obtained it from a Mr. Anthony Vicks.  The audiotape was played for the jury.

After the defendant gave Officer Crossen the statement, Officer Blankenship told the defendant that if he cooperated with the police by providing information on other suspects, the police officers would talk with the district attorney's office about getting the defendant a better deal.  According to Officers Crossen and Blankenship, the defendant attempted to beep Mr. Vicks, but Mr. Vicks did not respond.

Mr. Edgar Dunn, employed in the Jefferson Parish Sheriff's Office Crime

Laboratory, testified that he tested samples of the 123.19 grams of white substance contained in State Exhibit Number One, and that they tested positive for cocaine.  He also noted that no fingerprints were found on any of the plastic bags containing the cocaine. Officer Joe Williams was accepted as an expert in the customs and usages of narcotics and narcotics purchases.  He testified that the packaging of the cocaine was consistent with the packaging used by a street dealer or distributor.

Kendrick Chisolm testified on behalf of the defendant.  He testified that he had possessed the cocaine that was found in the car on July 18, 1997.  Chisolm explained that he got it from a friend and that he was planning to sell it and then pay his friend.  He testified that he had hidden the cocaine behind the glove compartment.  Chisolm said that he then picked up the defendant to go to the barbershop, and that the defendant did not know that the cocaine was in the car.

Mr. Chisolm admitted that he had sold and bought drugs in the past on a couple of occasions, and he testified that the defendant knew that he had done so in the past.  He also admitted that he had been charged with possession of cocaine with intent to distribute, that he pled guilty to these charges two days before the defendant's trial began, and that he had been placed on probation because it was his first conviction.

The defendant testified on his own behalf.  He explained that he told the police that the cocaine was his because he knew that Chisolm had never been to jail

before.  The defendant claimed that the officers told him that they would make sure he did

not "do any time in jail" if he would give them a statement.  The defendant testified that

no one named "Anthony Vicks" existed, and he admitted that he had not told the truth

when he gave his statement to the police.  He admitted that he had a prior conviction for

possession of crack cocaine and marijuana in 1994.  Although the defendant admitted that

he knew Chisolm had sold drugs in the past, he claimed that he was not aware that the

cocaine was in the car, and he denied ever touching the bags of cocaine.  He testified that

the police officers were lying about seeing him with a bag of cocaine in his hand while he

was riding in the car with Chisolm.

## III.  STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA")

includes a comprehensive overhaul of federal habeas corpus legislation, including 28

U.S.C. § 2254.  Amended subsections 2254(d)(1) and (2) contain revised standards of

review for questions of fact, questions of law and mixed questions of fact and law where

there has been an adjudication on the merits in State court proceedings.

State court determinations of questions of law and mixed questions of law

and fact are reviewed under 28 U.S.C. § 2254(d)(1) and receive deference unless they

were "contrary to, or involved an unreasonable application of clearly established Federal

law, as determined by the Supreme Court of the United States."  *Hill v. Johnson*, 210

F.3d 481, 485 (5th Cir. 2000).  The United States Supreme Court has advised that:

Under the "contrary to" clause, a federal habeas corpus court may grant the

writ if the state court arrives at a conclusion opposite to that reached by this Court on a

question of law or if the state court decides a case differently than this Court has on a set

of materially indistinguishable facts.  Under the "unreasonable application" clause, a

federal habeas court may grant the writ if the state court identifies the correct governing

legal principle from this Court's decisions but unreasonably applies that principle to the

facts of the prisoner's case.  *Williams v. Taylor*, 529 U.S. 1056, 120 S.Ct. 1495, 1523, 146

L.Ed.2d 389 (2000); *Hill*, 210 F.3d at 485.  Questions of fact found by the state court are

"presumed to be correct ... and we will give deference to the state court's decision unless

it `was based on an unreasonable determination of the facts in light of the evidence

presented in the State court proceeding.'"  *Hill*, 210 F.3d at 485, *quoting* 28 U.S.C.§

2254(d)(2).

## IV.  ANALYSIS

In support of the instant application for federal habeas corpus relief,

petitioner sets forth the following 13 arguments in support of his claim that he received

ineffective assistance of counsel.[5]

1) Counsel failed to examine police reports and failed to conduct a reasonable investigation in order to properly cross-examine officers regarding when they first saw cocaine and to attack the legality of his arrest;

2) Counsel failed to file a motion to suppress and failed to seek a continuance of trial;

3) Counsel failed to seek to have a juror excused due to his improper contact with a witness;

4) Counsel failed to object to the State's repetitive questioning of a witness regarding his prior discussions with defense counsel;

5) Counsel "open[ed] the door", during direct examination, to petitioner's prior arrest record;

6) Counsel failed to object to the judge's prejudicial comment regarding petitioner's testimony;

7) Counsel failed to object to the "prosecutor's bad character questions" and failed to request a mistrial;

8) Counsel failed to object to an improper prosecutorial comment which invited "jurors to consider the larger social implication of their verdict";

9) Counsel failed to object to the prosecutor's improper closing argument wherein he referred to petitioner as a liar for pleading guilty to a prior conviction;

10) Counsel failed to object to the trial court's reasonable doubt jury instruction;

---

[5]In its Response (rec. doc. 9, pp. 10-11, n. 4) to petitioner's arguments, the State notes, and this court's review has confirmed, that petitioner raises the same claims in the instant federal application for habeas corpus relief that he raised in connection with his state post-conviction application. Because certain briefs filed on behalf of petitioner in connection with his state post-conviction application contain more details than the memoranda submitted in connection with petitioner's federal habeas action, the court has reviewed, in connection with the instant action, not only petitioner's federal memoranda, but also his state court filings.

11) Counsel failed to request a jury instruction to the effect that a prior inconsistent statement used to impeach a witness cannot be used as substantive evidence of the defendant's guilt;

12) Counsel failed to object to Officer Crossen's hearsay testimony; and,

13) Counsel's misinformation resulted in petitioner's decision to reject a guilty plea offer and proceed to trial.

In addition to the above enumerated arguments, petitioner provides, under the sub-heading, "SUMMARY OF ARGUMENT", that counsel was unconstitutionally ineffective when he undertook petitioner's representation knowing that he was ineligible to practice law.

The seminal Supreme Court decision regarding ineffective assistance of counsel is *Strickland v. Washington*, 466 U.S. 668, 697, 104 S.Ct. 2052, 2069, 80 L.Ed.2d 674 (1984), wherein the Court held that in order to prove that counsel was ineffective, petitioner must demonstrate that counsel's performance was deficient and that the deficient performance prejudiced the defense.  If a court finds that petitioner has made an insufficient showing as to either one of the two prongs of inquiry, it may dispose of the claim without addressing the other prong.

Under the deficient performance prong of the *Strickland* test, "it is necessary to 'judge...counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.'" *Lockhart v. Fretwell*, 506 U.S. 364, 371, 113 S.Ct. 838, 844, 122 L.Ed. 2d 180 (1993), *citing Strickland*, 466 U.S. at 690, 104 S.Ct.

at 2066.  To prove prejudice under the *Strickland* standard, petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068.

### A.  Counsel's Ineligibility to Practice Law

It is undisputed that petitioner's counsel, Adam Cohen, at the time he represented petitioner at trial, was ineligible to practice law.  Cohen's ineligibility, however, was not the result of his failure to meet some substantive requirement, such as graduation from law school and passage of a state bar examination.  Rather, as the trial court observed in its March 11, 2004 Judgment denying petitioner's ineffective assistance of counsel claim, Cohen's ineligibility "was due to technical violations; failure to pay bar dues and failure to complete continuing education requirements".[6]

An attorney's suspension from the practice of law does not constitute a *per se* Sixth Amendment violation.  In a situation where an attorney's suspension or disbarment arises from "technical licensing requirements", such as a failure to attend a certain number of legal education seminars or to pay annual state bar dues, a petitioner is required, as specified under *Strickland*, to show a specific deficiency on the part of counsel which prejudiced him.  *See Reese v. Peters*, 926 F.2d 668, 669-670 (7th Cir.

---

[6]A copy of the trial court's March 11, 2004 Judgment is contained in the State rec., vol. 3 of 5.

1991) (no Sixth Amendment violation due to counsel's suspension from the bar, at the time he represented petitioner, due to his failure to pay dues); *Beto v. Barfield*, 391 F.2d 275, 275-276 (5th Cir.) (*per curiam*), *cert. denied*, 393 U.S. 888, 89 S.Ct. 205, 21 L.Ed.2d 166 (1968) (no entitlement to federal habeas corpus relief based upon fact that petitioner was represented by counsel suspended from the practice of law due to failure to pay membership dues to bar association).

Petitioner has specified in his supporting memorandum no deficiency on the part of counsel which prejudiced him.  Further, the state trial court, in rejecting petitioner's ineffectiveness claim, made the factual determination that counsel "provided appropriate and effective representation notwithstanding his technical ineligibility." Presuming the state trial court's factual determination to be correct, *see* 28 U.S.C. § 2254(e)(1), and based upon this court's independent examination, the court finds that petitioner has failed to satisfy either of *Strickland's* two prongs.  Accordingly, petitioner's ineffectiveness claim, based upon counsel's ineligibility to practice law, is without merit.

### B.  Counsel's Failure to Investigate/Failure to File Motion (Claims 1 and 2)

Petitioner claims that counsel failed to undertake a proper investigation of this matter which impaired his ability to attack the legality of petitioner's arrest. According to petitioner, counsel should have conducted a thorough examination of police reports in order to properly cross-examine the arresting officers regarding when they first

viewed cocaine inside the vehicle in which petitioner was a passenger and that counsel should have filed a motion to suppress with respect to the cocaine discovered inside the vehicle.[7]

As noted above, in order to prove ineffectiveness, for purposes of attaining federal habeas corpus relief, a petitioner must show that he was prejudiced by counsel's alleged deficiencies.  Petitioner, in this instance, has failed to make the requisite prejudice showing.

A review of the pertinent cross-examination of one of the arresting officers, Officer Thomas Blankenship, reflects that contrary to petitioner's suggestion, defense counsel extensively cross-examined the officer regarding when he first viewed cocaine inside the pertinent vehicle.  It was pursuant to defense counsel's cross-examination that Officer Blankenship admitted that his vantage point was less than ideal.  Specifically, Blankenship testified that his view was from the far side, i.e., the driver's side, of a pickup truck traveling alongside the driver's side of the vehicle in which petitioner was a passenger.[8]  Further, Blankenship admitted that he was able to see only one bag of

---

[7]Petitioner also claims that counsel should have filed a motion to continue trial presumably so he could have conducted a proper investigation and filed a pre-trial motion to suppress.  However, as shown *infra*, petitioner suffered no prejudice as a result of counsel's alleged deficiency in properly investigating the matter and filing a motion to suppress.  Accordingly, petitioner obviously suffered no prejudice due to counsel's alleged deficiency in failing to seek a continuance of trial so that he could properly investigate the matter and could file a motion to suppress.

[8]*See* State rec., vol. 1 of 5, p. 67, lines 4-25.

cocaine which was sitting on petitioner's lap.[9]  Defense counsel cast additional aspersions

on Blankenship's view by emphasizing the distance from which he was viewing the

inside of a moving vehicle and the small size of the bag which he saw in petitioner's lap.

> Q.  Okay.  So, when you observed him, if I understand you correctly, you saw him holding one of these individual packages?
>
> A.  One.
>
> Q.  Okay, so really – I can't open this because it's sealed, but really what you saw was something along the lines of what I have here in the corner of that bag?
>
> A.  That's correct.
>
> Q.  Okay, approximately how far away would you say your vehicle was to their vehicle, when you observed this?
>
> A.  Average, what, three, four feet, maybe.
>
> Q.  Okay.  Let's say if you're in your vehicle and I'm the passenger and you're looking through  the driver's side, am I farther or closer away than you are now?
>
> A.  I would say you're about that distance, maybe a tad bit farther, I mean, you know, I can't –
>
> Q.  It possibly could be farther away from where I am from you now?
>
> A.  Possibly.
>
> Q.  Okay.  So, you're basically saying that you were able to see him holding an object about that size in his lap from about that distance, in a moving vehicle?
>
> A.  That's correct.[10]

---

[9]*See* State rec., vol. 1 of 5, p. 67, lines 26-32 and p. 68, lines 1-3.

[10]*See* State rec., vol. 1 of 5, p. 68, lines 11-32 and p. 69, lines 1-6.

As for petitioner's claim that counsel was ineffective in failing to file a motion to suppress and challenge the legality of his arrest, a review of the pertinent testimony regarding the basis for the surveillance and ultimate arrest of petitioner and his cousin, Kendrick Chisolm, reflects that such a motion and challenge would have been futile.  Jefferson Parish Sheriff's Deputy Mike Crossen testified that pursuant to an anonymous tip received on the Jefferson Parish Sheriff's Office's "Hot Line", he was informed of the make, model, color and license plate number of a car in which two black males would be traveling for the purpose of transporting a "large quantity of cocaine" from "the Claiborne Gardens area ... to the Algiers area".[11]  Crossen testified that based upon the detailed information contained in the tip, he and his partner, Deputy Blankenship, set up a "stationary surveillance" pursuant to which they could observe "the entrances and exits of the Claiborne Gardens area".[12]  Thereafter, within 30 minutes of setting up their surveillance, Crossen observed a car heading toward Algiers which closely matched the description provided by the anonymous informant.  Specifically, Crossen testified:

> A.  It was a close description, when I first observed the vehicle exit the Claiborne Gardens area, and that's why I moved off of my stationary position and got directly behind the vehicle and observed that and verified that all the information that I received ... was correct.

_____

[11]*See* State rec., vol. 1 of 5, pp. 77-78.

[12]*See* State rec., vol. 1 of 5, p. 78.

The license plate matched exactly, and I further relayed that information to my partner, Agent Blankenship.

Q.  Okay.  Now, did you put that information, the description of the car in your police report?

A.  Yes, I did.

Q.  Okay.  And, when you saw that car, was it a 1993 car?

A.  Yes, sir.

Q.  Was it a Pontiac?

A.  Yes, sir.

Q.  Was it a two-door car?

A.  Yes, sir.

Q.  Was it a Grand Prix?

A.  Yes, sir.

Q.  Was it black in color?

A.  Yes, sir.

Q.  And, did it have a license plate number of FFE 550?

A.  Yes, sir.[13]

Based upon the fact that the informant's description matched the observed vehicle so closely, Crossen and Blankenship, in separate vehicles, followed the suspects.  Shortly thereafter, Blankenship pulled alongside the vehicle and saw a clear plastic bag containing a white substance sitting on the passenger's lap.  It was at that point that Crossen and Blankenship "proceeded to stop the vehicle."[14]

─────────────

[13]*See* State rec., vol. 1 of 5, p. 79, lines 14-32 and p. 80, lines, 1-8.

[14]*See* State rec., vol. 1 of 5, p. 81.

16

In determining the viability of a motion to suppress and the legality of a suspect's arrest, one must examine the "totality of the circumstances" surrounding the discovery of incriminating evidence supporting the subsequent arrest. *Alabama v. White*, 496 U.S. 325, 328, 110 S.Ct. 2412, 2415, 110 L.Ed.2d 301 (1990). An anonymous tip, such as the one received in this instance, in and of itself, is generally insufficient to justify an investigatory stop and subsequent arrest. However, such a tip, coupled with independent police work corroborating the information provided in the anonymous tip, generally provides the requisite "indicia of reliability" to pass constitutional muster.

In *White*, 496 U.S. at 327, 110 S.Ct. at 2414, police received a telephone call from an anonymous person informing that a woman  "would be leaving 235-C Lynwood Terrace Apartments at a particular time in a brown Plymouth station wagon with the right taillight lens broken, that she would be going to Dobey's Motel, and that she would be in possession of about an ounce of cocaine inside a brown attache case." Pursuant to the above tip, two police officers set up a surveillance at the Lynwood Terrace Apartments where they observed "a brown Plymouth station wagon with a broken right taillight in the parking lot in front of the 235 building." *Id*. Shortly thereafter, the officers observed a female exit from the 235 building and drive away in the brown Plymouth station wagon. The officers followed the station wagon as it proceeded toward Dobey's Motel, stopping it on a highway before it reached the motel. Pursuant to a consensual search, marijuana was discovered in a brown attache case located in the

17

station wagon.  Thereafter, while processing the suspect at the police station, three

milligrams of cocaine were discovered in her purse.

The Supreme Court in *White* rejected petitioner's constitutional challenge to

the investigatory stop of her vehicle and subsequent search and arrest.  The Court

reasoned:

> Reasonable suspicion, like probable cause, is dependent upon both the content of
> information possessed by police and its degree of reliability.  Both factors-quantity
> and quality-are considered in the "totality of the circumstances-the whole picture,"
> *United States v. Cortez,* 449 U.S. 411, 417, 101 S.Ct. 690, 695, 66 L.Ed.2d 621
> (1981), that must be taken into account when evaluating whether there is
> reasonable suspicion.  Thus, if a tip has a relatively low degree of reliability, more
> information will be required to establish the requisite quantum of suspicion than
> would be required if the tip were more reliable.  The [*Illinois v.*] *Gates* Court
> applied its totality-of-the-circumstances approach in this manner, taking into
> account the facts known to the officers from personal observation, and giving the
> anonymous tip the weight it deserved in light of its indicia of reliability as
> established through independent police work.  The same approach applies in the
> reasonable-suspicion context, the only difference being the level of suspicion that
> must be established.  Contrary to the court below, we conclude that when the
> officers stopped respondent, the anonymous tip had been sufficiently corroborated
> to furnish reasonable suspicion that respondent was engaged in criminal activity
> and that the investigative stop therefore did not violate the Fourth Amendment.

*White*, 496 U.S. at 330-331, 110 S.Ct. at 2416.

The law is clear that an attorney is under no obligation to raise an argument

when the chance of success is unlikely.  *See United States v. Kimler*, 167 F.3d 889, 893

(5th Cir. 1999) ("An attorney's failure to raise a meritless argument . . . cannot form the

basis of a successful ineffective assistance of counsel claim because the result of the

proceeding would not have been different had the attorney raised the issue."); *Sones v. Hargett*, 61 F.3d 410, 415 n.5 (5th Cir. 1995) ("Counsel cannot be deficient for failing to press a frivolous point."); *Clark v. Collins*, 19 F.3d 959, 966 (5th Cir. 1994) ("Failure to raise meritless objections is not ineffective lawyering; it is the very opposite.").  Based upon the above, the court finds it unlikely that a motion to suppress and challenge to the legality of petitioner's arrest would have been successful.  Accordingly, petitioner, by virtue of counsel's failure to file a motion to suppress and attack the legality of his arrest, suffered no prejudice.  Therefore, counsel was not unconstitutionally ineffective.

### C.  Counsel's Failure to Object to Prosecutor's Improper Questions and Comments (Claims 4, 8, 9 and 12)

Petitioner contends that he was prejudiced when:  1) The credibility of his chief defense witness, Kendrick Chisolm, was undermined due to the prosecution asking him eight times whether or not he had spoken to defense counsel prior to trial; 2) the prosecutor, during his closing remarks, invited jurors to consider the social implications of their verdict;[15] 3) the prosecutor, during his closing remarks, referred to petitioner as a

---

[15]Specifically, in response to defense counsel's closing remarks wherein aspersions were cast upon the credibility of Officers Blankenship and Crossen, the prosecutor stated:

> I think they [Blankenship and Crossen] should be commended for a job well done.  And, I think 10 years from now or 15 years from now, when your kids or your grandkids ask you, "How did we lose the war on drugs," I think we could be perfectly honest and tell them, "We were foolish enough to put our police departments, our police officers on trial instead of the drug dealers."

*See* State rec., vol. 1 of 5, p. 225, lines 14-24.

liar for having pled guilty to a prior drug charge when petitioner did not think he was guilty; 4) the prosecutor's direct examination of Officer Crossen elicited hearsay testimony informing that Crossen's partner had advised Crossen that petitioner, on the day of trial, had attempted to contact Crossen in order to make a deal;[16] and, 5) the prosecutor, during closing remarks, commented on petitioner's last minute attempt to make a deal, thereby undermining petitioner's defense that he was not aware of the cocaine found in the vehicle and that he had initially stated that the cocaine was his in an effort to protect his cousin.[17]  According to petitioner, his counsel was unconstitutionally ineffective due to his failure to object to the above questioning and closing remarks.

As noted earlier, to satisfy *Strickland's* prejudice prong, petitioner must show that it is reasonably probable that, but for counsel's failure to object to the above-described questioning and comments on the part of the prosecution, "the result of the proceeding would have been different."  *Id.*, 466 U.S. at 694, 104 S.Ct. at 2068.  No such showing has been made.

The evidence offered against petitioner at trial was overwhelming.  Officer Blankenship testified that from the vantage point of his truck, which was traveling alongside the vehicle in which petitioner was a passenger, he saw petitioner "holding a

---

[16]The pertinent direct testimony to which petitioner objects is located in the State rec., vol. 1 of 5, p. 92, lines 13-20.

[17]The objectionable closing remarks are located in the State rec., vol. 1 of 5, p. 228, line 32 and p. 229, lines 1-7.

clear plastic bag containing a white substance."[18]  Once the vehicle had been stopped and both petitioner and the vehicle's driver had exited the vehicle, Blankenship walked over, viewed inside the passenger side window, and saw two clear plastic bags containing a white substance sitting on the floorboard.[19]  Thereafter, when "backup" had arrived on the scene and the suspects had been secured, Blankenship, along with Officer Crossen, "proceeded back to the vehicle", "pulled down" a wire holding up the vehicle's glove compartment, and observed several clear plastic bags fall onto the floorboard.[20] Ultimately, 19 bags of cocaine were recovered from the vehicle.[21]

In light of such strong evidence reflecting that petitioner did indeed possess cocaine with the intent to distribute it, his defense that the 19 bags of cocaine belonged solely to the driver and he was unaware of their existence, in and of itself, is quite unbelievable.  As such, petitioner was not prejudiced by counsel's alleged deficiencies in failing to object to the prosecutor's repetitive questioning of Chisolm, to his questions provoking hearsay testimony from Crossen, to his inference that petitioner was a liar, and to his invitation to jurors to consider the social implication of discrediting the testimony

---

[18]*See* State rec., vol. 1 of 5, p. 61, lines 3-4.

[19]*See* State rec., vol. 1 of 5, p. 64, lines 1-9.

[20]*See* State rec., vol. 1 of 5, p. 64, lines 22-32 and p. 65, lines 1-9.

[21]*See* State rec., vol. 1 of 5, p. 65, lines 21-22.

of law enforcement officials.  Said deficiencies did nothing more than arguably cast

further aspersions on an already unbelievable defense.

### D. Evidence of Prior Arrests and Involvement with Drugs (Claims 5, 6 and 7); Failure to Request Impeachment Jury Charge (Claim 11)

Petitioner argues that defense counsel was ineffective for questioning him

about a prior arrest, thereby "opening the door" to the subject and enabling the

prosecution to question him regarding his arrest and his involvement with drugs.

However, as shown below, it was petitioner, rather than counsel, who "opened the door"

to questions from the prosecution regarding prior arrests and drug activities.

The trial transcript reflects that defense counsel commenced his direct

examination of petitioner with questions designed to offer jurors an explanation as to why

petitioner, as evidenced by a taped statement, initially informed investigating officers that

the 19 bags of cocaine belonged to him rather than to the vehicle's driver, Kendrick

Chisolm.

> BY MR. COHEN:
> Q.  You've heard the tape played of your statement in this case, isn't that true?
> A.  Yes, sir, I have.
> Q.  Okay.  And, do you contest in any way whether that statement was accurate, as to what you said?
> A.  The statement is pretty accurate, but, you know, the whole surrounding of the statement has been mislead and, you know, torn out of proportion.
> Q.  Why don't you tell me what you're talking about.[22]

---

[22]*See* State rec., vol. 1 of 5, p. 179, lines 19-30.

At that point, petitioner offered his explanation, informing:

> When we first got out of the car and they [law enforcement officials] said they [found] coke in the car, I knew it was Kendrick's mother's car.  I knew Kendrick had never been to jail before, so I said, "Leave him alone.  Leave him alone.  It's mine, it's mine."
>        And the officer said, "I'll make a deal with you.  We'll make sure you don't do any time in jail."  And, that was the reason for the statement.[23]

Thereafter, defense counsel did not ask petitioner whether he had any prior arrests.

Instead, petitioner volunteered this information in response to counsel's question

regarding why jurors should believe what petitioner was stating at trial, that the cocaine

belonged to the driver, Kendrick Chisolm, as opposed to what he initially told sheriff

deputies, that the cocaine belonged to him.

> Q.  Mr. Brindisi [the prosecutor] asked a very good question of Kendrick and I'm going to ask you the same question:  If what you're saying was a lie then, --
> A.  Yes.
> Q.  – to protect Kendrick, –
> A.  Yeah.
> Q.  –why should we believe that you're telling the truth now?
> A.  Well, because of the stakes, I guess.  I guess if they tell – if I know he has never been in trouble and his mother's car is at stake, and they tell – they come at me with a deal, you know, **I guess simply because I appear to be a drug dealer**, and they figure I could get someone.
>        **I guess – first of all, they ran my record before.  When we were on the car, they ran my record**....  [Emphasis added.][24]

---

[23]*See* State rec., vol. 1 of 5, p. 180, lines 3-11.

[24]*See* State rec., vol. 1 of 5, p. 181, lines 6-23.

At that point, the proverbial "cat had been let out of the bag", and counsel sought to make the best of a bad situation by contrasting the instant case wherein petitioner had opted to go to trial, with the prior case where he had pled guilty because he was guilty.  Counsel also sought to establish that up until his arrest on the charge for which he was being tried, petitioner had not run afoul of the law.  Specifically, defense counsel's questioning of petitioner continued as follows:

> Q.  And, do you have a police record?
> A.  Yes, I have a prior offense.
> Q.  Can you tell us –
> A.  Yes.
> Q.  –what those were for?
> A.  One rock of crack cocaine and possession of marijuana.
> Q.  Okay.
> A.  They ran that and then the big black fat guy said, "We could cut you a deal."
>      I said, "Okay, would you leave Mr. Chisholm [sic] alone, please?" That's why they brought us in separate rooms.
> Q.  When you mentioned that you had a police record for possession of cocaine and possession of marijuana, --
> A.  Yeah.
> Q.  – you are, in fact, admitting that you did do that crime?  Did you plead guilty in that case?
> A.  Yes, I pleaded guilty.
> Q.  Okay.  And you did, in fact, do that?
> A.  Yes.
> Q.  You're not disputing that now?
> A.  No.
> Q.  Okay.  How long ago was that?
> A.  That was in '94.
> Q.  Okay.  About three years ago or so?
> A.  Oh, yeah, and I've received a first offender's pardon for that.
> Q.  I'm sorry, what was that?
> A.  I received a first offender's pardon for that.

Q.  Okay.  And, you have not been arrested –
A.  No.
Q.  – until this incident?
A.  Until this incident.[25]

        Petitioner also complains that counsel was ineffective by virtue of the fact

that he failed to object to the following prejudicial remark on the part of the trial judge:

"You see, once he – this is now impeachment, because he said, "I've never been

arrested," et cetera, et cetera."  The above remark was made in response to defense

counsel's objection to the prosecutor, on cross-examination, confronting petitioner with

the fact that contrary to his direct examination testimony, petitioner had run afoul of the

law inbetween his 1994 drug conviction and the drug charge for which he was presently

standing trial.  Specifically, on cross-examination, the following exchange took place:

BY MR. BRINDISI:
Q.  Sir, before, when you were asked by your lawyer, you told him that you
had never been arrested or never been in trouble since this happened.
A.  Yeah.
Q.  Do you remember that?
A.  Yeah.
Q.  Okay.  And, you have never been arrested since then, have you?
A. Since....
Q.  Since the pardon.
A.  Since the pardon?  Yeah.
Q.  Okay.  What about March of '97, or this year?[26]

---

[25]*See* State rec., vol. 1 of 5, p. 181, lines 24-32 and p. 182, lines 1-27.

[26]*See* State rec., vol. 1 of 5, p. 186, lines 10-20 and 25-27.

At that point, defense counsel objected and the trial judge, in denying counsel's objection, made the above remark to which petitioner contends counsel should have objected.

Counsel's failure to object to the trial court's remark that the prosecution's questioning of petitioner was properly being used for impeachment purposes does not render counsel's performance unconstitutionally ineffective since such an objection would have been futile.  As noted earlier, an attorney is under no obligation to raise an objection when it is unlikely that the objection will be sustained.  *See Clark*, 19 F.3d at 966 ("Failure to raise meritless objections is not ineffective lawyering; it is the very opposite.")

Finally, it is petitioner's contention that counsel was ineffective for failing to request a jury charge advising that petitioner's inconsistent statements resulting in his impeachment could not be considered substantive evidence of petitioner's guilt. However, once again, because of the overwhelming evidence presented at trial reflecting that petitioner did indeed possess a substantial amount of cocaine with the intent to distribute it,[27] petitioner has failed to show that he was prejudiced as a result of counsel's alleged deficiency in failing to request "impeachment jury instructions".[28]

---

[27]*See* discussion *supra* at pp. 21-22.

[28]Petitioner's argument in this regard is contained in his "Supplement to Application for Post-Conviction Relief" filed with the 24th Judicial District Court for the Parish of Jefferson.  A copy of petitioner's supplemental brief is contained in the State rec., vol. 3 of 5.

**E.  Reasonable Doubt Charge (Claim 10)**

Petitioner complains that counsel was ineffective due to his failure to object to the trial court's reasonable doubt jury instruction.  A review of the trial transcript reflects that the court offered the following instruction to jurors with respect to the concept of reasonable doubt.

> A person accused of a crime is presumed, by law, to be innocent until each element of the crime necessary to constitute his guilt is proven beyond a reasonable doubt.
>
> **Reasonable doubt is doubt based on reason and common sense and is present when, after you have carefully considered all of the evidence, you cannot say that you are firmly convinced of the truth of this charge**.  It is the duty of the jury, in considering the evidence and in applying to that evidence the law as given by the Court, to give the Defendant the benefit of every reasonable doubt arising out of evidence in the case.
>
> And, it is the duty of the jury, if not convinced of the guilt of a defendant beyond a reasonable doubt, to find him not guilty.  [Emphasis added.][29]

Petitioner contends that counsel should have objected to the highlighted portion of the above charge.  According to petitioner, the highlighted portion is "constitutionally impermissible in that it lowers the standard established by *In Re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970), and in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), of proof beyond a reasonable doubt

---

[29]*See* State rec., vol. 1 of 5, p. 234, lines 29-32 and p. 235, lines 1-18.

of every fact necessary to constitute the crime with which he is charged, and violates the Due Process Clause of the Fourteenth Amendment."[30]

In *United States v. Williams*, 20 F.3d 125, 127-128 (5th Cir.), *cert. denied*, 513 U.S. 891, 115 S.Ct. 239, 130 L.Ed.2d 162 (1994), the jury was charged, in pertinent part:  "If, based on your consideration of all the evidence, you are **firmly convinced** that a defendant is guilty of the crime charged, you must find him guilty.  [Emphasis original.]"  Defendants argued that the above charge was unconstitutional because it "understated the level of proof that the government must meet to win a conviction...." *Id.* at 128.  The Fifth Circuit, however, disagreed, reasoning:

> The Due Process Clause of the Constitution requires the government to prove every element of a charged offense beyond a reasonable doubt.  *In re Winship,* 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970).  The Supreme Court has recently observed that, "[a]lthough this standard is an ancient and honored aspect of our criminal justice system, it defies easy explication."  *Victor v. Nebraska,* 511 U.S. at 5, 114 S.Ct. at 1242.  Perhaps for this reason, neither the Supreme Court nor this Court have ever required a particular definition of reasonable doubt to be read to the jury.  *See id.* at 5, 114 S.Ct. at 1243 ("[S]o long as the court instructs the jury on the necessity that the defendant's guilt be proven beyond a reasonable doubt, the Constitution does not require that any particular form of words be used in advising the jury of the government's burden of proof.") (citation omitted).  Nevertheless, any definition of reasonable doubt that a district court does use must, "taken as a whole, ... correctly convey[ ] the concept of reasonable doubt to the jury." *Holland v. United States,* 348 U.S. 121, 140, 75 S.Ct. 127, 138, 99 L.Ed. 150 (1954).

---

[30]*See* State rec., vol. 3 of 5, petitioner's "Application for Post Conviction Relief" filed with the 24th Judicial District Court for the Parish of Jefferson at pp. 10-11.

*Williams*, 20 F.3d at 128 (footnote omitted).

In this case, the court's instructions to the jury clearly conveyed the concept of reasonable doubt and that the government bore the burden of proving petitioner's guilt beyond a reasonable doubt.  Accordingly, counsel was not ineffective by virtue of his failure to object to the court's instructions.

## F.  Failure to Request that Juror be Excused (Claim 3)

Petitioner contends that counsel was unconstitutionally ineffective due to his failure to request that a juror be excused as a result of his alleged improper contact with one of the prosecution's witnesses.  A review of the trial transcript, however, reflects that there was no physical contact nor even any verbal exchange between the pertinent juror, a black male, and the witness, a black male police officer.  Instead, petitioner's mother, Lucille Simmons, the only witness to the alleged interaction, testified that after the witness had finished testifying and was sitting in the gallery, he and the male juror merely made eye contact and smiled at one another.[31]

A criminal defendant is constitutionally guaranteed the right to a fair trial by a panel of impartial jurors.  *Turner v. State of Louisiana*, 379 U.S. 466, 471, 85 S.Ct. 546, 549, 13 L.Ed.2d 424 (1965).  This constitutional right, however, is not violated by virtue of the above-described, innocuous interaction between a juror and witness.  *See*

---

[31]*See* State rec., vol. 1 of 5, pp. 123-125.

*U.S. v. Rodriquez*, 367 F.3d 1019, 1029-1030 (8th Cir. 2004), *cert. granted and judgment vacated on other grounds*, 543 U.S. 1101, 125 S.Ct. 1030, 160 L.ED.2d 1007 (2005) (no constitutional violation by virtue of court's failure to excuse juror following brief conversation between juror and witness on matter unrelated to witness's testimony). Accordingly, petitioner's claim for habeas corpus relief is without merit.

### G.  Misinformation Resulting in Decision to Reject Guilty Plea Offer and Proceed to Trial (Claim 13)

Prior to trial the prosecution offered petitioner a plea agreement pursuant to which, in exchange for his plea of guilty, petitioner would receive a 10-year sentence and would not be multiple billed.  Petitioner admits that defense counsel advised him of the above offer.  The problem arises, and provides the basis of petitioner's ineffectiveness claim, with respect to defense counsel's alleged misadvice regarding the sentence petitioner faced if he proceeded to trial and was found guilty.  According to petitioner, counsel advised that "the judge would set a sentencing cap at 15 years", and he "would not be multibilled".[32]  However, in actuality, following trial and the jury's subsequent guilty verdict, petitioner was multiple billed and was sentenced to 20 years incarceration.

---

[32]*See* State rec., vol. 3 of 5, petitioner's Second Supplement to Application for Post Conviction Relief filed with the 24th Judicial District Court for the Parish of Orleans at p. 1.

According to petitioner, "had he [had] the remotest idea what he was actually facing, he would have obviously pled guilty."[33]

A review of the pertinent record reflects that on September 24, 2002, Twenty-Fourth Judicial District Court Judge Greg Guidry conducted an evidentiary hearing with regard to defense counsel's representation of petitioner.  A review of the pertinent hearing testimony reflects inconsistent testimony on the part of petitioner with respect to what counsel informed him concerning whether he would or would not be multiple billed if he proceeded to trial and was found guilty.  During direct examination, petitioner testified that defense counsel informed that he "could get multi billed".[34]  Later, on cross-examination, petitioner responded affirmatively when counsel asked:  "He [defense counsel] knew that you had the prior conviction?  And he – you're saying that he told you that you were pardoned on that case, so therefore you could not be multiple billed?"[35]

In contrast, both Frank Brindisi, one of the Jefferson Parish Assistant District Attorneys who prosecuted petitioner's case, and defense counsel, Adam Cohen, testified that petitioner was aware of the fact that if he proceeded to trial and was found

---

[33]*See* Federal rec., doc. 1, petitioner's Memorandum in Support of 2254 Writ of Habeas Corpus at p. 11.

[34]*See* State rec., vol. 5 of 5, September 24, 2002 hearing transcript at p. 22, lines 16-17.

[35]*See* State rec., vol. 5 of 5, September 24, 2002 hearing transcript at p. 24, lines 5-9.

guilty he could be multiple billed.  Specifically, Brindisi confirmed that he offered

petitioner a plea agreement pursuant to which, in exchange for petitioner's plea of guilty,

he would receive a 10-year sentence and would not be multiple billed.[36]  Brindisi further

testified that several of his plea negotiations with defense counsel were conducted in the

presence of both petitioner and petitioner's mother.  Brindisi testified that he advised

them that petitioner was subject to being multiple billed and that if he declined the plea

offer and "went to trial and ... was convicted, ... he would be facing 15 years minimum to

60 years maximum on a double bill...."[37]

   Similarly, it was the understanding of defense counsel, Adam Cohen, that

petitioner was aware of the fact that if he proceeded to trial and was found guilty, he

would be double billed.  Specifically, Cohen testified that petitioner informed him that

petitioner had received "a pardon" in connection with his first drug conviction.[38]  Though

Cohen was skeptical with regard to the accuracy of petitioner's information since, in

Cohen's opinion, such a "pardon" would have been "very unusual", Cohen, nevertheless,

"brought the issue up with the District Attorney".[39]  Cohen testified that after they

---

[36]*See* State rec., vol. 5 of 5, September 24, 2002 hearing transcript, p. 27, lines 16-20.

[37]*See* State rec., vol. 5 of 5, September 24, 2002 hearing transcript, p. 28, lines 5-14.

[38]*See* State rec., vol. 5 of 5, September 24, 2002 hearing transcript at p. 30, lines 21-22.

[39]*See* State rec., vol. 5 of 5, September 24, 2002 hearing transcript at p. 30, lines 22-23 and lines 27-29.

32

discussed the matter, "we came to the conclusion that it wouldn't affect [petitioner's] status as far as being a multiple bill.  That he would still be multiple billed."[40]  According to Cohen, this information was conveyed to petitioner.[41]

In *Gochicoa v. Johnson*, 238 F.3d 278, 285 (5th Cir. 2000), the Fifth Circuit reiterated the well-established principle that a habeas petitioner "bears the burden of proving both *Washington* prongs".  Based upon the above, the court finds that petitioner has failed, with respect to both prongs, to satisfy his burden of proof.

Accordingly;

## RECOMMENDATION

It is hereby **RECOMMENDED** that the application for federal habeas corpus relief filed on behalf of petitioner, Toriano Jordan, be **DENIED WITH PREJUDICE**.

---

[40]*See* State rec., vol. 5 of 5, September 24, 2002 hearing transcript at p. 30, lines 31-32 and p. 31, lines 1-2.

[41]Specifically, Cohen testified as follows:
Q.  Did you so advise the defendant?
A.  When I found out, yes, we might not have actually known – I can't recall the time of the events.  It might have been as late as the day of the trial that we discovered that.
Q.  You did advise him that he would be multiple billed if he lost at trial?
A.  I cannot recall me specifically doing it but I couldn't imagine not telling him what the circumstances were.
Q.  Had you know[n], you would have told him?
A.  Had I known, I would have definitely told him.
*See* State rec., vol. 5 of 5, September 24, 2002 hearing transcript at p. 31, lines 3-14.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within 10 days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. *Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1430 (5th Cir. 1996).

New Orleans, Louisiana, this 18th day of April, 2006.


LOUIS MOORE, JR.

United States Magistrate Judge

34